## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EVELYN LYLES,                                      :
                                                   :
      Plaintiff,                           :     Civil Action No.:    10-1424 (RC)
                                                   :
      v.                                   :     Re Document Nos.:   45, 47
                                                   :
DISTRICT OF COLUMBIA,                              :
                                                   :
      Defendant.                           :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Evelyn Lyles brings this employment discrimination action against her former employer, the District of Columbia's Department of Mental Health ("District").  She alleges that the District discriminated against her on the basis of her sex and her disability in violation of Title VII of the Civil Rights Act of 1964.  She also alleges that her employer retaliated against her by transferring her to a different department when she filed an EEOC complaint against it.  The defendants moved for summary judgment on all claims.  For the reasons that follow, the Court will grant in part and deny in part the defendant's motion.

## II.  FACTUAL BACKGROUND

Evelyn Lyles began working for the District of Columbia's Department of Mental Health in 1994 as a Vocational Rehabilitation Specialist.  *See* Second Am. Compl. ¶ 1, ECF No. 9 ("Compl.").  She worked in the Department's Supported Employment Program, which was part of the Department's Community Service Administration.  *See* Def.'s Mot. Summ. J. 1, ECF No. 45. Her job entailed "providing a full range of consumer employment and vocational

rehabilitation services for persons with severe and persistent mental[] illnesses . . . . [with] [e]mphasis . . . on empowering individuals to change their own lives . . . ." Pl.'s Ex. 2 at 9, ECF No. 46-3. From 2002 until 2003, Ms. Lyles generally received good or excellent work performance evaluations from her then-supervisor, Deborah Hobbs. *See* Pl.'s Opp'n Mot. 3, ECF No. 46. In 2003, the District hired Carroll Parks to serve as the Director of the Adult Services Program (also within the Supported Employment Program), and he became Ms. Lyles's supervisor. *See id.* Mr. Parks also gave Ms. Lyles excellent work performance evaluations from 2003 through 2006. *See id.*

### A. Allegations of Sexual Harassment

In the fall of 2006, Mr. Parks hired Steven Miller to join Ms. Lyles's team. Ms. Lyles served as Mr. Miller's supervisor. *Id.* Ms. Lyles alleges that from March 2007 through August 2008, Mr. Miller "verbally and physically sexually harassed" her. *See* Pl.'s Ex. 10, Pl.'s Resp. to Interrogatory No. 5, ECF No. 46-11. She alleges that Mr. Miller "made lewd gestures toward [her], including imitating that he was spanking [her]." *Id.* In addition, he "would go out of his way when passing [her] in the hall to brush up next to her." *Id.* Ms. Lyles also alleged that on or around August 2007, Mr. Miller "grabbed [her] breast while they were in [her] office." *Id.* Even after he was transferred to a different office in November 2007, he would find ways to harass her, by "brush[ing] up close against [her] and star[ing] menacingly at her." *Id.* In her formal complaint to the EEOC, Ms. Lyles stated that the sexual hostile work environment "consisted of [Mr. Miller] being inappropriate with his language. He would pat me on my buttocks and make gestures with his hands as if he was jingling [sic] a butt." *See* Pl.'s Ex. 33, ECF No. 46-34. He also told her he would have to take her somewhere to give her a spanking. *See id.* She testified in her deposition that "there were times where he would make verbal slurs about I could spank

you and that would change your ways . . . [a]nd different times I would take information into his office and he would make hand gestures as though he was juggling boobs with his hands." Lyles Dep. 80:13-19, ECF No. 46-12. He would also try to close the door when Ms. Lyles would come into his office, even though she would ask him not to. Lyles Dep. 80:20-22–81:1-4.

Ms. Lyles also received reports that Mr. Miller sexually harassed two other women. According to Ms. Lyles, around March or April 2007, Melody Crutchfield told her that Mr. Miller walked up behind her and grabbed her (Ms. Crutchfield's) breasts. *See* Lyles Dep. 69:12–22; *see also* Pl.'s Ex. 12 Alleged Conduct of Steven Miller – Supported Employment Program at 1, ECF No. 46-13. Also according to Ms. Lyles, around June 2007, Ms. Joan Mitchell reported to her that Mr. Miller had "approached her from behind, [and] he pressed his penis against the middle of her buttocks indicating that he was excited." *See id.* at 3. Another co-worker of Ms. Lyles (according to Ms. Lyles), Ms. Carolyn Stevens, told Ms. Lyles that Ms. Mitchell had reported to her that Mr. Miller had "grabbed [Ms. Mitchell's] breasts." *See id.* at 2.

Ms. Lyles explained that she did several things in response to these reports, and in response to her own alleged harassment. She first called Mrs. Green at the personnel office. Mrs. Green suggested that Ms. Lyles contact Brendolyn McCarty-Jones, the Senior Labor Relations Specialist for the Community Services Administration. Ms. Jones advised Ms. Lyles to contact Mr. Parks. *See* Lyles Dep. at 77–78. On or around June 14, 2007, Ms. Lyles contacted Mr. Parks to report her concern with Mr. Miller. *See* Pl.'s Ex. 12 at 1; *see also* Pl.'s Resp. to Interrogatory No. 4, ECF No. 46-2 ("[p]laintiff met with Carroll Parks regarding Mr. Miller's behavior toward the Plaintiff, and toward two other women, Melody Crutchfield and Joan Mitchell. In this meeting, the Plaintiff informed Mr. Parks of harassment that she was experiencing from Mr. Miller"). Mr. Parks told Ms. Lyles to write up her allegations, which she

did in a statement she prepared on June 19, 2007. *See* Pl.'s Ex. 12 at 1 (explaining that the statement "is provided as a follow-up to the verbal report that I made to you on June 14, 2007 regarding allegations made against Mr. Steven Miller"). That document described Ms. Mitchell's and Ms. Crutchfield's incidents of sexual harassment, but did not include Ms. Lyles's own allegations of sexual harassment against Mr. Miller.[1]

In addition, according to Ms. Lyles, in January 2008, she met with Gillian Daniels, an Administrative Officer for the Vocational Rehabilitation Division regarding the harassment from Mr. Miller. *See* Pl.'s Resp. to Interrogatory No. 4, ECF No. 46-2. Ms. Daniels suggested that Ms. Lyles reach out to an EEO Officer for the Department of Mental Health named Mr. Boone. *See id.* Ms. Lyles contacted him by email and by voicemail in February and March of 2008. *See id.* Mr. Boone reported that his Department was unable to resolve her complaint. *See id.*

Ms. Lyles then filed a formal EEOC Complaint on June 4, 2008, where she alleged that she had been discriminated against on the basis of her sex and her disability, and had been subjected to a hostile work environment. *See* Def.'s Ex. K, ECF No. 45-2. On July 29, 2008, the defendant issued a "Statement of Position," analyzing Ms. Lyles's claims. It found Ms. Lyles's allegations to be unfounded. *See* Def.'s Ex. F at 3–4, ECF No. 45-1. In that Statement of Position, the District stated that "the two female employees the Complainant [Ms. Lyles] identified refused to validate the Complainant's report. As a result, the Manager had no complaint to take on behalf of the employees identified." *See id.* at 3. In that report, the District

---

[1]     Mr. Miller also submitted his own complaint of a hostile work environment against Ms. Lyles to Mr. Parks. *See* Pl.'s Opp'n Mot. 6–7, ECF No. 46. Though he stated in his deposition that he initially complained about an incident that occurred with Ms. Lyles in February of 2007, *see* Miller Dep. at 45:8–9, ECF No. 46-10, the only documentation he submitted to Mr. Parks, dated July 16, 2007, describes an incident that occurred on June 29, 2007. *See* Pl.'s Ex. 16, ECF No. 46-17; Pl.'s Ex. 17, ECF No. 46-18.

also took the position that Ms. Lyles "*never reported to them* [that] she was a victim of sexual harassment." *See id.* (emphasis in original).

## B. Allegations of Disability Discrimination

Ms. Lyles also alleges that as a result of her harassment by Mr. Miller, her symptoms of Post-Traumatic Stress Disorder ("PTSD") and Depression, which she had been diagnosed with in 1999, began to flare up. *See* Pl.'s Opp'n Mot. at 7. She alleges that she first requested accommodations for this disability in an email dated January 10, 2008, to Stephen Baron, the Director for the Department of Mental Health. *See* Pl.'s Ex. 19, ECF No. 46-20. She followed-up this email with another email to him dated February 21, 2008. *See* Pl.'s Ex. 20, ECF No. 46-21. In both emails, she mentioned that she intended to file complaints to the EEOC regarding her alleged mistreatment at work. She also wrote Mr. Baron another email dated April 21, 2008, to which he briefly replied the next day.[2] *See* Pl.'s Ex. 21, ECF No. 46-22.

Ms. Lyles's doctor, Dr. John Galotto, submitted a letter to Mr. Baron on June 27, 2008, requesting that Ms. Lyles be reassigned to a "non-threatening, non-hostile work environment for medical reasons." See Pl.'s Ex. 23, ECF No. 46-24. Mr. Baron responded to this request on July 2, 2008, explaining that he had referred the letter and the accommodation request to Ms. Juanita Price (Mr. Parks's supervisor). *See id.*

---

[2]     The purpose of these emails is unclear. While the plaintiff argues in her brief that the emails (1) requested a reasonable accommodation for her disability, and (2) informed Mr. Baron of her hostile work environment claims, the content of the letters vaguely—if at all—addresses these issues. *See* Pl.'s Ex. 19 ("As a person with a disability which occurred at the Commission of Mental Health and of which has redeveloped because of the DMH . . . ."); Pl.'s Ex. 20 (letter discussing her frustrations with the administration, but also mentioning that she "hesitated to communicate with [him] again after having been threatened twice since [she] met with [him]" . . . and saying at the end that she is "filing an EEO complaint" for various concerns); Pl.'s Ex. 21 (discussing frustrations with co-workers and mentioning at the end that she "further express[es her] fears and concerns of retaliation and hostilities").

On August 28, 2008, Mr. Parks wrote a letter to Ms. Lyles informing her that she was being detailed from the Supported Employment Program to the Day Services Program "[d]ue to loss of staff in the Day Program to the Early Out and resignations . . . ." *See* Pl.'s Ex. 24, ECF No. 46-25. In this role, Ms. Lyles claims she was no longer permitted to do client assessments, but instead was "responsible for driving case managers around in the community, watching, and observing their home visits as an aide, and later completing the home checklist to turn in at the end of the day." *See* Pl.'s Resp. to Interrogatory Nos. 16 & 17, ECF No. 46-2; *see also* Pl.'s Opp'n Mot. at 8–9.

On November 6, 2008, Ms. Lyles was again reassigned, this time to the Community Support Team ("CST") 3. *See* Pl.'s Ex. 25, ECF No. 46-26. This detail was not specific to Ms. Lyles, rather, everyone involved in the Day Services Program was reassigned due to the closure of the program. *See, e.g.*, Def.'s Ex. J, ECF No. 45-2 (letter dated March 3, 2008 explaining that the "Supported Employment Program [was] in the process of redesign"); Def.'s Ex. N, ECF No. 45-2 ("The reassignment is due to the closing of the day services and other needs within the Adult Services."); Pl.'s Ex. 26, ECF No. 46-27 ("due to closure of day program she was reassigned to CST 3").

On May 20, 2009, the defendant notified Ms. Lyles that she would be separated from District government services effective August 1, 2009. *See* Def.'s Mot. Summ. J. at 9. Ms. Lyles commenced the instant action on August 24, 2010. *See* Compl., ECF No. 1.

\* \* \*

Ms. Lyles brought this action claiming that she was discriminated against on the basis of her sex by being subjected to a hostile work environment, that she was discriminated against on

the basis of her disability and her age, and that she was retaliated against in six ways[3] for filing

an EEOC complaint against her employer.  *See* Second Am. Compl. 6–10, ECF No. 9.  The

plaintiff conceded her Age Discrimination in Employment Act ("ADEA") claim (Count III), as

well as her claim that the District retaliated against her by not promoting her.  *See* Pl.'s Opp'n

Mot. 1 n.1.[4]  The defendant moved for summary judgment on all remaining claims, which are the

hostile work environment claim (Count I), the disability discrimination claim (Count II), and the

retaliation claim (Count IV) regarding her transfer to the Day Program.  The Court now turns to

the relevant legal standards.

## III.  ANALYSIS

### A.  Legal Standard on a Motion for Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

R. CIV. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the

litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is

"genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-

movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

---

[3]     In an opinion dated April 14, 2011, the Court granted the defendant's motion for summary judgment as to four of the six retaliation claims in Count IV: charging the plaintiff thirty-two hours AWOL, failure to return plaintiff to her former position, eliminating plaintiff's position through reduction-in-force ("RIF"), and failing to pay severance.  *See* Mem. Op. at 20, ECF No. 18.  The Court also granted the Defendant's motion for summary judgment as to the plaintiff's DC Human Rights Act claims in Counts I–IV.  *See* Mem. Op. & Order, ECF Nos. 18 & 19.  Given that four of the retaliation claims were dismissed for failure to exhaust, and one of them has been conceded by the defendant, only one retaliation claim remains pending before this Court: the detail to the Day Services Program.  The other claims that remain, as set forth above, are the hostile work environment claim in Count I, and the disability discrimination claim in Count II.

[4]     As such, the Court enters judgment for the defendant on Count III and the failure to promote retaliation claim in Count IV.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## B. Sex Discrimination

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Sex discrimination includes creating a hostile or abusive work environment if the harassment is sufficiently abusive to affect a term, condition, or privilege of employment." *Davis v. Coastal Intern. Sec., Inc.*, 275 F.3d 1119, 1122 (D.C. Cir. 2002) (citation omitted). To make a prima facie hostile work environment case under Title VII, the plaintiff must show that "(1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering

with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment; and (5) the existence of respondeat superior liability." *Id.* at 1122–23 (citation omitted).

The parties' briefs address two issues with respect to the hostile work environment claim. The parties disagree on whether the sexual harassment conduct at issue here was severe or pervasive enough to constitute a hostile work environment. *See* Def.'s Mot. Summ. J. at 9–11; Pl.'s Opp'n Mot. at 15–18. They also disagree on whether the District can be held liable for the conduct of Mr. Miller. *See* Def.'s Mot. Summ. J. at 6–9, Pl.'s Opp'n Mot. at 10–15. The Court addresses both in turn.

### 1. Severe or pervasive conduct

The District will only be liable for sexual harassment if Ms. Lyles can show that the discriminatory conduct at issue was severe or pervasive. "Sexual harassment creates a hostile environment only if it is so 'severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment.'" *Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C. Cir. 2009) (quoting *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986)). As the Supreme Court has explained, "in order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive . . . ." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993)). In determining whether a hostile work environment exists, courts "look[] to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).

In this jurisdiction, "even multiple instances of physical contact and sexual advances may not be sufficient to meet the demanding legal standard for a hostile work environment." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 77 (D.D.C. 2013). Several cases prove instructive here. In *Akonji v. Unity Healthcare, Inc.*, the plaintiff pointed to five distinct incidents of sexual harassment over an eighteen-month period. 517 F. Supp. 2d 83, 97–98 (D.D.C. 2007). Specifically, she pointed to an incident where a co-worker "touched her buttocks, and tried to kiss her." *Id.* at 97. She also pointed to another incident where a co-worker tried to kiss her, an incident where a co-worker touched her thigh during a performance review, an incident of her co-worker asking her on a date, and a co-worker calling her beautiful. *Id.* at 98. The Court found that those acts of alleged harassment, "comprised of five discrete acts over the two-year period as well as infrequent inappropriate comments and staring, do not reach the level of 'severe' or 'extremely serious' conduct that is required by the Supreme Court to state a claim for hostile-work environment discrimination." *Id.* Similarly in *Carter v. Greenspan*, the plaintiff alleged that a co-worker caressed him on his knee, placed her breast on his arm, and placed her fingers on his buttocks. 304 F. Supp. 2d 13, 25 (D.D.C. 2004). The court there found that "these three isolated incidents are not sufficiently severe in quantity or quality to unreasonably interfere with plaintiff's work performance or create a hostile work environment." *Id.* Meanwhile, in *Johnson v. Shinseki*, the plaintiff alleged that a co-worker made inappropriate comments to her and that that behavior became more aggressive over time. 811 F. Supp. 2d 336, 346 (D.D.C. 2011). The plaintiff also alleged that her co-worker attempted to kiss her, made solicitations for sex, grabbed and pinched her breasts, and grabbed and spanked her behind. *Id.* The court there found that the fact that the harassment caused the plaintiff to leave the workforce and seek

medical treatment, along with the "escalating nature" of the harassment was sufficient to constitute a hostile work environment. *Id.*

In this case, Ms. Lyles alleges that the following incidents of sexual harassment occurred beginning in March 2007: (1) that Mr. Miller would "pat [her] on [her] buttocks," *see* Pl.'s Ex. 33, ECF No. 46-34; (2) that Mr. Miller "made lewd gestures toward [her], including imitating that he was spanking [her]," *see* Pl.'s Ex. 10, Pl.'s Resp. to Interrogatory No. 5, ECF No. 46-11; (3) that he "would go out of his way when passing [her] in the hall to brush up next to her," *see id.*; (4) that on or around August 2007, Mr. Miller "grabbed [her] breast while they were in [her] office," *see id.*; (5) that even after he was transferred to a different office in December 2007, he would find ways to harass her, by "brush[ing] up close against [her] and star[ing] menacingly at her," *see id.*; and (6) that at times, he made "lewd gestures with his hands and tongue." Pl.'s Ex. 10, Pl.'s Resp. to Interrogatory No. 7, ECF No. 46-11. She also testified in her deposition that "there were times where he would make verbal slurs about I could spank you and that would change your ways . . . [a]nd different times I would take information into his office and he would make hand gestures as though he was juggling boobs with his hands." Lyles Dep. 80:13-19, ECF No. 46-12.

Examining these allegations as a whole shows that there is a genuine dispute of material fact as to whether Mr. Miller's conduct was severe or pervasive so as to constitute a hostile work environment; therefore, the question is more appropriately reserved for the jury. With respect to the frequency of the alleged conduct, the fact that Mr. Miller *would* pat Ms. Lyles on her buttocks, *would* make offensive hand gestures, and *would* go out of his way to brush up next to her suggest that these incidents were ongoing, and happened repeatedly. Indeed, Ms. Lyles alleges that "Miller's sexual harassment of [her] took place at least once a week [between March

2007 and August 2008] and caused [her] severe emotional pain and distress."  Compl. ¶ 10.

These allegations, therefore, make this case distinguishable from *Akonji* and *Carter*, where the

alleged incidents were isolated or infrequent.

With respect to the severity of the conduct, Ms. Lyles alleges that Mr. Miller "would pat

her on her buttocks" (suggesting severity *and* frequency), and that he grabbed her breast.  A

reasonable juror could find that such touching was both severe and offensive.  In addition, a

reasonable juror could find that the lewd gestures—including Mr. Miller's use of his "hands and

tongue," and his repeated references to spanking—were offensive and therefore, in conjunction

with everything else, constituted severe or pervasive conduct.

Moreover, Ms. Lyles also stated that her PTSD and depression returned as a result of her

alleged sexual harassment.  *See* Pl.'s Ex. 18, ECF No. 46-19.  Both objectively and subjectively,

then, there is a genuine issue of material fact as to whether Ms. Lyles was subjected to a severe

or pervasive hostile work environment.  The Court cannot find as a matter of law that the

conduct at issue here was not severe or pervasive because a reasonable fact-finder could

determine that it was.  As such, summary judgment for the District is not appropriate.

### 2.  The District's Liability

Having found that there is a genuine issue of material fact as to the severe or pervasive

element of Ms. Lyles's prima facie case, the Court must still analyze whether the District can be

held liable for Mr. Miller's actions.  If the District cannot be held liable, then Ms. Lyles's hostile

work environment claim fails as a matter of law.

An employer's liability for the acts of its employees in the hostile work environment

context generally turns on whether the harasser is the plaintiff's supervisor or co-worker.  The

parties have briefed this issue under the assumption that the Supreme Court's decisions in

*Faragher v. City of Boca Raton*, and *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998)

control this case. Those cases establish the standard for an employer's liability when the alleged

*harasser* is the plaintiff's *supervisor*. In *Faragher*, the Court established that "[a]n employer is

subject to vicarious liability to a victimized employee for an actionable hostile environment

created by a supervisor[5] with immediate (or successively higher) authority over the employee."

524 U.S. at 807. An employer, however, may successfully raise an affirmative defense if it can

show the following two elements: "(a) that the employer exercised reasonable care to prevent

and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee

unreasonably failed to take advantage of any preventive or corrective opportunities provided by

the employer or to avoid harm otherwise." *Id.*; *see also Burlington*, 524 U.S. at 765.

When the alleged harasser is the plaintiff's co-worker, a different standard governs—that

set forth in *Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C. Cir. 1999). In *Curry*, the

D.C. Circuit found that "[a]n employer's liability for a hostile work environment sexual

harassment claim differs depending on who does the harassing." 195 F.3d at 659. The Circuit

held that, when the harasser *is not a supervisor*: "[a]n employer may be held liable for the

harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or

should have known of the harassment and failed to implement prompt and appropriate corrective

action." *Id.* at 660. Other circuits have also adopted this standard for assessing an employer's

liability in the context of co-worker harassment. *See, e.g.*, *Gallagher v. C.H. Robinson*

---

[5]     Most recently, the Supreme Court has clarified the definition of "supervisor," holding that "an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013) (citation omitted).

*Worldwide, Inc.*, 567 F.3d 263, 276 (6th Cir. 2009) ("An employer is vicariously liable for co-worker harassment of which it knew or should have known if it failed to take appropriate remedial action, *i.e.*, if its response manifests indifference or unreasonableness."); *Williams v. ConAgra Poultry, Co.*, 378 F.3d 790, 794–95 (8th Cir. 2004) ("If the harassment comes from non-supervisory employees, the plaintiff must also show that the employer knew or should have known about the harassment but failed to take proper action."); *see also Noviello v. City of Boston*, 398 F.3d 76, 95 (1st Cir. 2005) (same).

This case, however, presents a unique factual twist on the employer liability prong of a sexual harassment analysis—that of a *subordinate* (Mr. Miller) allegedly harassing a supervisor (Ms. Lyles). Neither the Supreme Court nor the D.C. Circuit has had occasion to decide whether an employer can be vicariously liable when a subordinate employee sexually harasses his or her supervisor. In fact, very few courts have *ever* been faced with this issue.[6] To assess the District's liability, then, the Court must establish a framework for analyzing an employer's liability where a subordinate allegedly harasses his or her supervisor.[7]

In this case, the Court finds that the *Curry* standard should apply in the context of subordinate-to-supervisor harassment—with an important exception: An employer may be held liable for the harassment of a supervisor by a subordinate if the employer knew or should have known of the harassment and failed to implement prompt and appropriate action; but an

---

[6] *See* Ann Carey Juliano, *Harassing Women with Power: The Case of Including Contra-Power Harassment Within Title VII*, 87 B. U. L. REV. 491, 516–523 (2007) (discussing how the author could find only twenty-four federal cases or agency actions where the issue has ever arisen).

[7] No court has ever held that, as a matter of law, an employer cannot be liable for a subordinate's harassment of his or her supervisor. *See, e.g.*, *Parada v. Great Plains Intern. of Sioux City, Inc.*, 483 F. Supp. 2d 777, 797 n.6 (N.D. Iowa 2007) (explaining in dicta that "this court cannot conclude that an alleged harasser's status as a 'subordinate' of a plaintiff necessarily or as a matter of law means that the 'subordinate' cannot engage in actionable harassment").

employer will not be liable for the sexual harassment of a supervisor by a subordinate where the supervisor-plaintiff had the ability to stop the harassment[8] and failed to do so. The Court finds this standard to be the most appropriate because it empowers the supervisor to remove or reprimand the subordinate-harasser, while ensuring that if the supervisor is unable to address the harassment and reports the subordinate-harasser to her supervisors, *i.e.*, takes action to stop the harassment, and it is unsuccessful or the employer resists such actions, the employer will still be liable for allowing the hostile work environment to persist despite being on notice of the problem. Other courts confronting this issue have developed a similar standard, albeit less explicitly. *See, e.g.*, *Mingo v. Roadway Express, Inc.*, 135 F. Supp. 2d 884, 891, 898 (N.D. Ill. 2001) (noting that the plaintiff, a female supervisor, "never reprimanded, counseled, or disciplined any of [the] dock workers whom she supervised for their [offensive] comments," but ultimately finding that there was a genuine issue of material fact as to whether her employer had notice of her sexual harassment allegations and failed to do something about it); *Cronin v. United Serv. Stations, Inc.*, 809 F. Supp. 922, 930–31 (M.D. Ala. 1992) (entering judgment for the plaintiff-supervisor because she reported incidents of her subordinate harassing her to her supervisor and he failed to act); *Perkins v. General Motors Corp.*, 709 F. Supp. 1487, 1497–98 (W.D. Mo. 1989) (finding that because the plaintiff supervisor "knew how to use the available disciplinary procedures and ha[d] the supervisory power to stop the conduct and punish the offender," and failed to do so, the employer could not be liable for creating a sexually hostile work environment); *Lewis v. Sugar Creek Stores, Inc.*, No. 96-CV-0100E(H), 1996 WL 685730,

---

[8] This could include reporting the harassment to the supervisor's own supervisor, but it could also include doing something to effect a "significant change in employment status," *see Vance,* 133 S. Ct. at 2443, of the harasser, such as firing, or reprimanding the employee. This will be different in each case, depending on the authority the particular supervisor has over the particular harasser.

at *2 (W.D.N.Y. Nov. 25, 1996) (stating that it is not true that "as a matter of law, an employee cannot bring a hostile environment claim where the conduct that created the hostile environment was committed by the employee's subordinate(s)" and explaining that in determining the employer's liability at the summary judgment stage, it makes a difference whether the supervisor-plaintiff had the authority to stop the harassment by her subordinate and failed to do so); *see also Henlon v. Chambers*, 195 W. Va. 99, 108–109 (W. Va. 1995) ("if a supervisor complains to her employer of a subordinate's harassment and the employer responds, 'You take care of it,' that may in some cases be sufficient—if the supervisor has full disciplinary authority and circumstances permit use of it. In other cases, however, that response may be inadequate.").

Though the Court finds this to be the appropriate standard, the parties have not briefed whether this legal standard should apply, and if so, whether Ms. Lyles—as a matter of law—has met it. On the one hand, Ms. Lyles, as Mr. Miller's supervisor,[9] may have been in a position "to take tangible employment actions" against him—indeed, she wrote an evaluation of his work and never mentioned the alleged incidents of sexual harassment. *See* Pl.'s Ex. 12, ECF No. 46-13; *see also* Def.'s Mot. Summ. J. at 8. This could suggest that she had the ability to stop the harassment and failed to do so. On the other hand, if removal was required to address the harassment, it is unclear whether Ms. Lyles could have removed Mr. Miller, as *her* supervisor, Mr. Parks, was responsible for Mr. Miller's hiring. *See* Def.'s Ex. E, ECF No. 45-1.

And moreover, it is unclear whether Mr. Parks was on notice of Ms. Lyles's allegations, as there seems to be a genuine issue of material fact as to whether Ms. Lyles brought *her*

---

[9] In his deposition, Mr. Miller states that he believed Mr. Parks was his direct supervisor. *See* Miller Dep. at 25, ECF No. 46-10. Ms. Lyles, however, alleges that Mr. Miller was her subordinate. *See* Second Am. Compl. ¶ 10, ECF No. 9. To the extent the parties think Mr. Miller's status relative to Ms. Lyles is an issue, they may say so once the defendant files a renewed motion for summary judgment.

allegations against Mr. Miller to Mr. Parks's attention. While the District argues that there is an "absence of any facts demonstrating that the District knew about Mr. Miller's alleged harassment of Plaintiff," *see* Def.'s Reply at 6–7, Mr. Parks's deposition suggests otherwise. *See* Parks Dep. at 57–58, ECF No. 46-8 (saying that he was informed that Ms. Lyles "made claims that Mr. Miller sexually harassed her" and also stating, "I do recall there was an incident that she had alleged, I recall that . . . . I'm saying I remember something about a phone call. I'm not sure if the phone call came from Ms. Lyles or Ms. Yearwood about her concern about interacting with Mr. Miller, I believe."). That, combined with Ms. Lyles's own statements[10] that she informed Mr. Parks about her sexual harassment in June 2007, *see* Pl.'s Resp. to Interrogatory No. 4, would seem to raise a genuine issue of material fact as to whether (1) Ms. Lyles ever took action herself to stop the harassment by reporting it to her supervisor[11] and (2) if she did, whether the District failed to take prompt or appropriate action in response.[12] Because factual issues

---

[10]    Though the defendant argues in its reply that Ms. Lyles only relies on her own self-serving statements to create a genuine issue of material fact, the D.C. Circuit has stated that "'there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion.'" *Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008) (quoting *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005)).

[11]    The District of Columbia's, and in turn, the Department of Mental Health's Sexual Harassment Policy provides that "[a]ny supervisor or manager who receives a complaint or concern regarding sexual harassment or inappropriate conduct must take reasonable steps to ensure that an investigation is conducted or that other appropriate action is taken . . . ." *See* Def.'s Ex. A at 3, ECF No. 45-1. Ms. Lyles took action by contacting Mr. Parks but it is unclear whether she was supposed to do anything else, or whether she had the authority to "effect a significant change in [Mr. Miller's] employment status." *See Vance*, 133 S. Ct. at 2443. The Court needs more information from the parties to be able to say whether, as a matter of law, Ms. Lyles was required to do more than put her supervisors on notice, and if so, what that was, and if not, whether her supervisors did anything in response.

[12]    The second part of the *Curry*-modified analysis that the Court establishes today—whether the District failed to take prompt and appropriate corrective action—also presents a genuine issue of material fact that the Court need not decide at this time. This issue, however, is legally intertwined with another motion pending before the Court: a motion for an adverse inference that the District was negligent in acting on Ms. Lyles's harassment claims because it

surround the legal framework outlined by the Court today, and the parties have not briefed them

fully, the Court must deny without prejudice the defendant's motion for summary judgment on

the hostile work environment claim, so that the parties may renew their motions in light of the

Court's ruling.

### C. Disability Discrimination[13]

Ms. Lyles also claims that the District discriminated against her due to her disability

under the Americans with Disabilities Act of 1990.  Pl.'s Opp'n Mot. at 1.  Courts generally

analyze disparate treatment disability discrimination claims under the *McDonnell Douglas*

burden-shifting framework.  *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288–89 (D.C. Cir.

1998) (en banc).  Under this framework, the plaintiff bears the burden of establishing "'a prima

facie case of discrimination by a preponderance of the evidence.  If the plaintiff establishes a

prima facie case, the employer must then articulate a legitimate, non-discriminatory reason for its

actions.  The plaintiff must then demonstrate that the employer's stated reason was pretextual

and that the true reason was discriminatory.'"  *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir.

2003) (quoting *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002)).  A plaintiff can establish a

prima facie case by showing that "(1) she is a member of a protected class; (2) she suffered an

---

can no longer locate Mr. Parks's personnel files.  *See* ECF No. 47.  Because the Court denies without prejudice the District's motion for summary judgment on the hostile work environment claim as a whole, it will likewise deny the motion for an adverse inference without prejudice.  To the extent the parties find it necessary to re-brief this issue in light of the Court's ruling, they may do so when the defendant files its renewed motion for summary judgment on the hostile work environment claim.

[13]    Though Ms. Lyles mentions the District's "failure to accommodate" her in her complaint and her brief, she neither alleges nor briefs the issue of whether she was discriminated against under a failure to accommodate theory. The Court construes Ms. Lyles's claim—like the Court did at the motion to dismiss stage, as only stating a disparate treatment discrimination claim and not a failure to accommodate claim.  *See Lyles v. District of Columbia*, 777 F. Supp. 2d 128, 137 (D.D.C. 2011) ("The Court reads the plaintiff's assertion that defendant failed to accommodate her disability in the 'Facts' section of her Complaint as background for the formal claim in Count II . . . .").

adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *See Stella*, 284 F.3d at 145 (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).

The D.C. Circuit, however, has modified the *McDonnell-Douglas* test, finding that "the question whether the employee made out a prima facie case is almost always irrelevant." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). Therefore, instead,

> in considering an employer's motion for summary judgment or judgment as a matter of law [in a disparate treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision], the district court must resolve one central question: *Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?*

*Id.* at 494 (emphasis added). The Supreme Court has explained that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (emphasis in original).

Ms. Lyles claims that the District discriminated against her based on her disability when the District detailed Ms. Lyles to the Day Services Program in August 2008, and then subsequently transferred her to the Community Support Team in November 2008.[14] Pl.'s Opp'n Mot. at 20. The District, however, proffered non-discriminatory reasons for both the detail and subsequent transfer. First, the District asserted that Ms. Lyles was detailed from the Supported

---

[14]     Although a lateral transfer without reduction in pay is usually not an adverse employment action, *see Hayslett v. Perry,* 332 F. Supp. 2d 93, 105 (D.D.C. 2004) ("A lateral transfer with no diminution of pay or benefits is not an adverse action absent 'some other materially adverse consequences' that resulted in 'objectively tangible harm.'") (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)), the District does not challenge this claim on that basis.

Employment Program to the Day Services Program to make up for "loss of staff in the Day Program." Def.'s Ex. L, ECF No. 45-2. Second, the District asserted that Ms. Lyles was subsequently transferred from the Day Services Program to the Community Support Team because the Day Services Program "was in the process of being shut down as part of a restructuring of the entire DMH." Def.'s Mot. Summ. J. at 12; *see also* Def.'s Ex. N ("The reassignment is due to the closing of the day services and other needs within the Adult Services."). Both of these proffered reasons are non-discriminatory, which shifts the burden to Ms. Lyles to prove that discrimination was the real reason, and that the proffered reasons were pretextual.[15] *Brady,* 520 F.3d at 494.

Ms. Lyles provided no evidence indicating that the District's reasons were pretextual and that the District's real reason for transferring her was discrimination based on her disability. She argues that she was treated differently from other workers. While it is true that no other staff was detailed to the Day Services Program initially in August 2008,[16] there is nothing on the record, and Ms. Lyles points to nothing on the record to suggest that Mr. Parks made that decision based on any discriminatory animus he had toward Ms. Lyles's disability of PTSD, or disabled individuals in general. And with respect to the CST move, Ms. Lyles was not treated differently at all, because *all* her co-workers were reassigned to that unit after the Day Program was completely shut down. Ms. Lyles provided no evidence whatsoever that the District's

---

[15] Ms. Lyles argues that "[t]here is no evidence to support the Defendant's claim that Ms. Lyles was treated similarly to her co-workers . . . ." *See* Pl.'s Opp'n Mot. at 21–22. But the defendant's burden is not one of persuasion, but of production—as such, it was not required to *prove* its reasons by a preponderance of the evidence; it merely had to *produce* a legitimate non-discriminatory reason for its action, which it did. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) (explaining that the employer's burden is one of production only, and noting that "the Title VII plaintiff at all times bears the ultimate burden of persuasion").

[16] Because of the different elements of a claim for retaliation and a claim for discrimination, this finding does not preclude the Court from reaching a different conclusion in the context of retaliation.

reason was false or that it harbored any hostility toward her for being disabled. Ms. Lyles, therefore, failed to show "enough evidence to allow a reasonable trier of fact to conclude that the employer's [asserted reasons are] unworthy of credence and merely a pretext for discrimination." *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (citations omitted). As such, the Court enters judgment for the District on this claim.

### D.  Retaliation

Ms. Lyles's final allegation is that the District retaliated against her when it detailed her to the Day Services Program and subsequently transferred her to the Community Support Team. Pl.'s Opp'n Mot. at 22. Retaliation claims under Title VII of the Civil Rights Act follow an analogous framework to discrimination claims under the Americans with Disabilities Act. *See Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (stating that the only difference between a discrimination claim and retaliation claim is in establishing a prima facie case of retaliation, which requires: (1) that the employee engaged in a protected activity; (2) that the employer took an adverse action against the employee; and (3) that a causal connection existed between those two actions).

Once an employer asserts a legitimate, non-retaliatory reason for the adverse action against the employee, "'a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence,' which includes not only the prima facie case but also the evidence the [employee] offers to 'attack the employer's proffered explanation for its action' and other evidence of retaliation." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (quoting *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)). An employee can overcome this burden by demonstrating a "material dispute on the ultimate issue of retaliation 'either directly by showing that a discriminatory reason more likely motivated the

employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Jones*, 557 F.3d at 678 (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)).

Though discrimination and retaliation claims are similarly analyzed, the D.C. Circuit has explained one difference in the elements: that "'[a]dverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim." *Baloch*, 550 F.3d at 1198 n.4. This is because, "[r]etaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006)). A "materially adverse action" in the retaliation context "means [that] it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (quoting *Burlington N.*, 548 U.S. at 68); *accord Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010).

As previously stated, the District proffered non-retaliatory reasons to explain the adverse actions against Ms. Lyles. First, the District asserted that Ms. Lyles was detailed from the Supported Employment Program to the Day Services Program in response to a need for staff at the Day Services Program. Def.'s Ex. L, ECF No. 45-2. Second, the District asserted that Ms. Lyles was subsequently transferred from the Day Services Program to the Community Support Team because of a complete restructuring of the Department of Mental Health, which included the Day Services Program being shut down. *See* Def.'s Mot. Summ. J. at 12, Def.'s Ex. N.

In response to the District's proffered non-retaliatory reason for Ms. Lyles's detail to the Day Services Program, Ms. Lyles primarily relies on her prima facie case of retaliation (*see* Pl.'s Opp'n 20–21), which is a factor the court may consider. *Jones*, 557 F.3d at 679 ("the court reviews each of the three relevant categories of evidence—prima facie, pretext, and any other— to determine whether they either separately or in combination provide sufficient evidence for a reasonably jury to infer retaliation") (citation omitted). In this case, the protected activity Ms. Lyles engaged in was filing various EEOC complaints, both informally and formally. Ms. Lyles complained to Mr. Baron about an unlawful hostile work environment in January, February, and April of 2008.[17] *See* Pl.'s Opp'n Mot. at 20–21. *See also* Pl.'s Resp. to Interrogatory No. 4. Additionally, in February of 2008, Ms. Lyles sent a complaint to the Department of Mental Health's EEO Counselor (Mr. Boone) and notified Mr. Baron about that complaint. Pl.'s Opp'n Mot. at 23. *See also* Pl.'s Ex. 20, ECF No. 46-21. On June 4, 2008, Ms. Lyles filed an official complaint with the U.S. Equal Employment Opportunity Commission. *See* Pl.'s Ex. 33, ECF No. 46-34.

The first adverse action taken, according to Ms. Lyles, was her detail to the Day Services Program in August of 2008. Pl.'s Opp'n Mot. at 23. Ms. Lyles argues that her new position with the Day Services Program "significantly diminished" her responsibilities and duties; while her principal focus in her previous position was client assessments, she no longer performed client assessments in her positions with the Day Services Program or the Community Support Team. *See* Pl.'s Opp'n Mot. at 20, 23. Instead, Ms. Lyles was responsible for "driving case managers around in the community, watching and observing their home visits as an aide, and later

---

[17]     Again, as set forth *supra* in n.2, the content of these letters is vague, though, they mention in various places Ms. Lyles's intention of filing EEO complaints against the Department of Mental Health.

completing the home checklist to turn in at the end of the day." Pl.'s Opp'n Mot. at 20; *see also* Pl.'s Resp. to Interrogatory No. 10, ECF No. 46-11. Courts have found that "reassignment with significantly different responsibilities . . . generally indicates an adverse action." *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (quoting *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002)); *see also Burlington*, 524 U.S. at 761. Because the District does not argue that the transfers were not materially adverse, the Court assumes without deciding that they were.

With respect to the causal connection here, the August 2008 detail to the Day Services program followed closely on the heels of Ms. Lyles's June 2008 EEOC complaint. However, the D.C. Circuit has required "'positive evidence beyond mere proximity to defeat the presumption that the [employer's] proffered explanations are genuine.'" *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)). *See also Woodruff*, 482 F.3d at 530 ("If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim.").[18]

The Court finds that there is positive evidence beyond mere proximity to defeat the presumption that the employer's proffered explanations are genuine. For instance, both parties agree that Ms. Lyles had always received acceptable work reviews from the District in her

---

[18]     Though courts in this jurisdiction do not entirely agree on whether two months "represents the outer bounds at which courts have been willing to infer causal connection," that difficult question only arises where the causal connection is "based merely on temporal proximity." *See Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 79–80 (D.D.C. 2009). In this case by contrast, there is more than just two months in time that gives the Court pause about granting summary judgment for the District. The timing, in addition to the diminished responsibilities, and the fact that Ms. Lyles had always received good reviews and had never before been transferred, could suggest retaliatory motive. As such, the Court need not resolve whether two months does indeed mark the outer bounds of the temporal proximity analysis.

positions preceding the detail and transfer, including her most recent review for her work as a Vocational Rehabilitation Specialist, which rated Ms. Lyles's work as "excellent." Pl.'s Ex. 8, ECF No. 46-9. And, moreover, from 1994 until her transfer to the Day Services program in August 2008, she worked in the same position, and had never before been transferred. *See Lyles v. District of Columbia*, 777 F. Supp. 2d 128, 138 (D.D.C. 2011); *see also* Compl. ¶ 1. Based on the fact that Ms. Lyles's responsibilities were substantially diminished, that the timing of her initial detail to the Day Services Program is suspect, and that she had never been transferred in her fourteen prior years of service until she filed an EEOC complaint against her employer, the Court finds that there is a genuine issue of material fact as to whether the District retaliated against Ms. Lyles for engaging in protected activity when it initially detailed her to the Day Services Program.[19]

With respect to her transfer to the Community Support Team in November 2008, however, Ms. Lyles has proffered no evidence to the contrary with respect to the legitimate, non-retaliatory reason provided by the employer. That transfer was due to the employer's restructuring of the Department of Mental Health as a whole and affected all employees in the Day Services Program. As such, the Court finds that the plaintiff has failed to establish that the District's subsequent transfer of her from the Day Services Program to the CST 3 unit was retaliatory.

Because there is a "material dispute on the ultimate issue of retaliation," as to Ms. Lyles's initial detail to the Day Services Program, so that a reasonable jury could infer retaliation, *Jones*, 557 F.3d at 678, summary judgment for the District is denied. However, because there is no

---

[19] The Court also notes that the District's legitimate non-retaliatory reason is very weak. Although it claims that the transfer was occasioned by a need for staff at the Day Services Program, nowhere does it explain why that staff need was filled by Ms. Lyles, rather than any other individual.

material dispute on the ultimate issue of retaliation as to her detail to CST 3, judgment is entered for the District on that claim.

## IV.  CONCLUSION

For the foregoing reasons, the defendant's motion is granted in part and denied in part. As to the hostile work environment claim in Count I, the defendant shall submit a renewed motion for summary judgment within three weeks of entry of this Memorandum Opinion, addressing only the legal standard set forth in Section III.B.2.  As to the disability discrimination claim in Count II, the Court enters judgment for the District.  As to the retaliation claim in Count IV, the Court denies the District's motion for summary judgment as to Ms. Lyles's detail to the Day Services Program only.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 20, 2014.                                             RUDOLPH CONTRERAS
                                                                        United States District Judge