UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| EVELYN LYLES, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 10-1424 (RC) |
| | : | | |
| v. | : | Re Document No.: | 57 |
| | : | | |
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND MOTION FOR RECONSIDERATION

**I. INTRODUCTION**

The plaintiff Evelyn Lyles brought this employment discrimination action against her employer, the District of Columbia's Department of Mental Health ("District"). Ms. Lyles alleged that she was discriminated against, retaliated against, and subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act. *See generally* Second Am. Compl., ECF No. 9. The District moved for summary judgment, and on February 20, 2014, this Court granted in part and denied in part that motion. *See* Mem. Op., ECF No. 53 (February 20, 2014). Specifically, the Court granted the District's motion for summary judgment on all but the following two claims: (1) Plaintiff's Count I for sexual harassment and (2) part of Plaintiff's Count IV for retaliation. As to Count I, the Court instructed the defendant to file a renewed motion for summary judgment in light of the legal standard the Court set forth for a hostile work environment claim in its Memorandum Opinion. *See* Order, ECF No. 52 (February 20, 2014). As to Count IV, the Court found that there was a genuine issue of material fact as to whether the District's proffered reason for

transferring Ms. Lyles to the Day Services Program was a pretext. Pending before the Court now is the defendant's renewed motion for summary judgment, along with a motion for reconsideration on the retaliation claim. For the reasons that follow, the Court will deny the District's motion on both grounds.

## II. FACTUAL BACKGROUND

### A. Facts as Stated in Prior Memorandum Opinion

The Court recounts the facts as stated in its prior Memorandum Opinion at 1–6, with a few minor modifications:

Evelyn Lyles began working for the District of Columbia's Department of Mental Health in 1994 as a Vocational Rehabilitation Specialist. *See* Second Am. Compl. ¶ 1, ECF No. 9 ("Compl."). She worked in the Department's Supported Employment Program, which was part of the Department's Community Service Administration. *See* Def.'s Mot. Summ. J. 1, ECF No. 45. Her job entailed "providing a full range of consumer employment and vocational rehabilitation services for persons with severe and persistent mental[] illnesses . . . . [with] [e]mphasis . . . on empowering individuals to change their own lives . . . ." Pl.'s Ex. 2 at 9, ECF No. 46-3. From 2002 until 2003, Ms. Lyles generally received good or excellent work performance evaluations from her then-supervisor, Deborah Hobbs. *See* Pl.'s Opp'n Mot. 3, ECF No. 46 (citing Pl.'s Exs. 4 & 5, ECF Nos. 46-5 & 46-6). In 2003, the District hired Carroll Parks to serve as the Director of the Adult Services Program (also within the Supported Employment Program), and he became Ms. Lyles's supervisor. *See id.* Mr. Parks gave Ms. Lyles excellent work performance evaluations from 2004 through 2006. *See id.* (citing Pl.'s Exs. 6 & 8 (Evaluations), ECF Nos. 46-7 & 46-9).

### B. Allegations of Sexual Harassment

In the fall of 2006, Mr. Parks hired Steven Miller to join Ms. Lyles's team. Ms. Lyles served as Mr. Miller's supervisor. *Id.* Ms. Lyles alleges that from March 2007 through August 2008, Mr. Miller "verbally and physically sexually harassed" her. *See* Pl.'s Ex. 10, Pl.'s Resp. to Interrogatory No. 5, ECF No. 46-11. She alleges that Mr. Miller "made lewd gestures toward [her], including imitating that he was spanking [her]." *Id.* In addition, he "would go out of his way when passing [her] in the hall to brush up next to her." *Id.* Ms. Lyles also alleged that on or around August 2007, Mr. Miller "grabbed [her] breast while they were in [her] office." *Id.* Even after he was transferred to a different office in November 2007, he would find ways to harass her, by "brush[ing] up close against [her] and star[ing] menacingly at" her. *Id.* In her formal complaint to the EEOC, Ms. Lyles stated that the sexual hostile work environment "consisted of [Mr. Miller] being inappropriate with his language. He would pat me on my buttocks and make gestures with his hands as if he was jingling [sic] a butt." *See* Pl.'s Ex. 33, ECF No. 46-34. He also told her he would have to take her somewhere to give her a spanking. *See id.* She testified in her deposition that "there were times where he would make verbal slurs about I could spank you and that would change your ways . . . [a]nd different times I would take information into his office and he would make hand gestures as though he was juggling boobs with his hands." Lyles Dep. at 80:13-19, ECF No. 46-12. He would also try to close the door when Ms. Lyles would come into his office, even though she would ask him not to. Lyles Dep. at 80:20-22–81:1-4.

Ms. Lyles also received reports that Mr. Miller sexually harassed two other women. According to Ms. Lyles, around March or April 2007, Melody Crutchfield told her that Mr. Miller walked up behind her and grabbed her (Ms. Crutchfield's) breasts. *See* Lyles Dep. at 69:12–22; *see also* Pl.'s Ex. 12 Alleged Conduct of Steven Miller – Supported Employment

Program at 1, ECF No. 46-13. Also according to Ms. Lyles, around June 2007, Ms. Joan Mitchell reported to her that Mr. Miller had "approached her from behind, [and] he pressed his penis against the middle of her buttocks indicating that he was excited." *See id.* at 3. Another co-worker of Ms. Lyles (according to Ms. Lyles), Ms. Carolyn Stevens, told Ms. Lyles that Ms. Mitchell had reported to her that Mr. Miller had "grabbed [Ms. Mitchell's] breasts." *See id.* at 2.

Ms. Lyles explained that she did several things in response to these reports, and in response to her own alleged harassment. She first called Mrs. Green at the personnel office. Mrs. Green suggested that Ms. Lyles contact Brendolyn McCarty-Jones, the Senior Labor Relations Specialist for the Community Services Administration. Ms. Jones advised Ms. Lyles to contact Mr. Parks. *See* Lyles Dep. at 77–78. On or around June 14, 2007, Ms. Lyles contacted Mr. Parks to report her concern with Mr. Miller. *See* Pl.'s Ex. 12 at 1; *see also* Pl.'s Resp. to Interrogatory No. 4, ECF No. 46-2 ("[p]laintiff met with Carroll Parks regarding Mr. Miller's behavior toward the Plaintiff, and toward two other women, Melody Crutchfield and Joan Mitchell. In this meeting, the Plaintiff informed Mr. Parks of harassment that she was experiencing from Mr. Miller"). Mr. Parks told Ms. Lyles to write up her allegations, which she did in a statement she prepared on June 19, 2007. *See* Pl.'s Ex. 12 at 1 (explaining that the statement "is provided as a follow-up to the verbal report that I made to you on June 14, 2007 regarding allegations made against Mr. Steven Miller"). That document described Ms. Mitchell's and Ms. Crutchfield's incidents of sexual harassment, but did not include Ms. Lyles's own allegations of sexual harassment against Mr. Miller.[1]

---

[1] Mr. Miller also submitted his own complaint of a hostile work environment against Ms. Lyles to Mr. Parks. *See* Pl.'s Opp'n Mot. 6–7, ECF No. 46. Though he stated in his deposition that he initially complained about an incident that occurred with Ms. Lyles in February of 2007, *see* Miller Dep. at 45:8–9, ECF No. 46-10, the only documentation he

4

In addition, according to Ms. Lyles, in January 2008, she met with Gillian Daniels, an Administrative Officer for the Vocational Rehabilitation Division regarding the harassment from Mr. Miller. *See* Pl.'s Resp. to Interrogatory No. 4, ECF No. 46-2. Ms. Daniels suggested that Ms. Lyles reach out to an EEO Officer for the Department of Mental Health named Mr. Boone. *See id.* Ms. Lyles contacted him by email and by voicemail in February and March of 2008. *See id.* Mr. Boone reported that his Department was unable to resolve her complaint. *See id.*

Ms. Lyles then filed a formal EEOC Complaint on June 4, 2008, where she alleged that she had been discriminated against on the basis of her sex and her disability, and had been subjected to a hostile work environment. *See* Def.'s Ex. K, ECF No. 45-2. On July 29, 2008, the defendant issued a "Statement of Position," analyzing Ms. Lyles's claims. It found Ms. Lyles's allegations to be unfounded. *See* Def.'s Ex. F at 3–4, ECF No. 45-1. In that Statement of Position, the District stated that "the two female employees the Complainant [Ms. Lyles] identified refused to validate the Complainant's report. As a result, the Manager had no complaint to take on behalf of the employees identified." *See id.* at 3. In that report, the District also took the position that Ms. Lyles "*never reported to them* [that] she was a victim of sexual harassment." *See id.* (emphasis in original).

## C. Allegations of Disability Discrimination

Ms. Lyles also alleges that as a result of her harassment by Mr. Miller, her symptoms of Post-Traumatic Stress Disorder ("PTSD") and Depression, which she had been diagnosed with in 1999, began to flare up. *See* Pl.'s Opp'n Mot. at 7. She alleges that she first requested accommodations for this disability in an email dated January 10, 2008, to Stephen Baron, the Director for the Department of Mental Health. *See* Pl.'s Ex. 19, ECF No. 46-20. She followed-

---

submitted to Mr. Parks, dated July 16, 2007, describes an incident that occurred on June 29, 2007. *See* Pl.'s Ex. 16, ECF No. 46-17; Pl.'s Ex. 17, ECF No. 46-18.

up this email with another email to him dated February 21, 2008. *See* Pl.'s Ex. 20, ECF No. 46-21. In both emails, she mentioned that she intended to file complaints to the EEOC regarding her alleged mistreatment at work. She also wrote Mr. Baron another email dated April 21, 2008, to which he briefly replied the next day.[2] *See* Pl.'s Ex. 21, ECF No. 46-22.

Ms. Lyles's doctor, Dr. John Galotto, submitted a letter to Mr. Baron on June 27, 2008, requesting that Ms. Lyles be reassigned to a "non-threatening, non-hostile work environment for medical reasons." *See* Pl.'s Ex. 23, ECF No. 46-24. Mr. Baron responded to this request on July 2, 2008, explaining that he had referred the letter and the accommodation request to Ms. Juanita Price (Mr. Parks's supervisor). *See id.*

On August 28, 2008, Mr. Parks wrote a letter to Ms. Lyles informing her that she was being detailed from the Supported Employment Program to the Day Services Program "[d]ue to loss of staff in the Day Program to the Early Out and resignations . . . ." *See* Pl.'s Ex. 24, ECF No. 46-25. In this role, Ms. Lyles claims she was no longer permitted to do client assessments, but instead was "responsible for driving case managers around in the community, watching, and observing their home visits as an aide, and later completing the home checklist to turn in at the end of the day." *See* Pl.'s Resp. to Interrogatory Nos. 16 & 17, ECF No. 46-2; *see also* Pl.'s Opp'n Mot. at 8–9.

---

[2] The purpose of these emails is unclear. While the plaintiff argues in her brief that the emails (1) requested a reasonable accommodation for her disability, and (2) informed Mr. Baron of her hostile work environment claims, the content of the letters vaguely—if at all—addresses these issues. *See* Pl.'s Ex. 19 ("As a person with a disability which occurred at the Commission of Mental Health and of which has redeveloped because of the DMH . . . ."); Pl.'s Ex. 20 (letter discussing her frustrations with the administration, but also mentioning that she "hesitated to communicate with [him] again after having been threatened twice since [she] met with [him]" . . . and saying at the end that she is "filing an EEO complaint" for various concerns); Pl.'s Ex. 21 (discussing frustrations with co-workers and mentioning at the end that she "further express[es her] fears and concerns of retaliation and hostilities").

On November 6, 2008, Ms. Lyles was again reassigned, this time to the Community Support Team ("CST") 3. *See* Pl.'s Ex. 25, ECF No. 46-26. This detail was not specific to Ms. Lyles, rather, everyone involved in the Day Services Program was reassigned due to the closure of the program. *See, e.g.*, Def.'s Ex. J, ECF No. 45-2 (letter dated March 3, 2008 explaining that the "Supported Employment Program [was] in the process of redesign"); Def.'s Ex. N, ECF No. 45-2 ("The reassignment is due to the closing of the day services and other needs within the Adult Services."); Pl.'s Ex. 26, ECF No. 46-27 ("due to closure of day program she was reassigned to CST 3").

On May 20, 2009, the defendant notified Ms. Lyles that she would be separated from District government services effective August 1, 2009. *See* Def.'s Mot. Summ. J. at 9. Ms. Lyles commenced the instant action on August 24, 2010. *See* Compl., ECF No. 1.

### D. Procedural Posture in this Case

On February 20, 2014, the Court ruled on the District's pending motion for summary judgment. *See* Mem. Op. & Order, ECF Nos. 52 & 53 (February 20, 2014). The Court granted the District's motion as to one of the alleged adverse employment actions in the plaintiff's retaliation claim in Count IV, and as to its disability discrimination claim in Count II. The Court, however, denied the District's motion as to another alleged adverse employment action in the plaintiff's retaliation claim (the transfer to the Day Services Program). The Court also denied the District's motion as to the plaintiff's sex discrimination/hostile work environment claim, and ordered the District to renew its motion for summary judgment in light of the legal standard the Court set forth for subordinate-to-supervisor sexual harassment. Now pending before the Court is that renewed motion, along with the District's motion for reconsideration on the retaliation claim that remains. Because there is still a genuine issue of material fact as to whether Ms. Lyles

7

had the ability to stop the sexual harassment, the Court denies the District's renewed motion for summary judgment on that Count. And because the District has made no new, compelling argument on the retaliation claim, the Court denies the District's motion for reconsideration.

## III. ANALYSIS

### A. Legal Standard

#### 1. Motion for Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* FED. R. CIV. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless,

conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

2. Motion for Reconsideration

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims or the rights and liabilities" of the parties that does not end the case "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." FED. R. CIV. P. 54(b). "The Court has broad discretion to hear a motion for reconsideration brought under Rule 54(b)." *Isse v. Am. Univ.*, 544 F. Supp. 2d 25, 29 (D.D.C. 2008). The district court's discretion is "limited by the law of the case doctrine and subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2009) (citation omitted). Though different courts "apply a variety of different standards when confronted with a motion for reconsideration," *see Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005), this jurisdiction has established that reconsideration is appropriate "as justice requires." *Id.* at 540; *see also Capitol Sprinkler Inspection, Inc. v. Guest Services, Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (explaining that Rule 54(b) recognizes a district court's power to reconsider an interlocutory order "as justice requires" (citation omitted)). "Considerations a court may take into account under the 'as justice requires' standard include whether the court 'patently' misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law has occurred." *Williams v. Johanns*, 555 F. Supp. 2d 162, 164 (D.D.C. 2008) (citing *Singh*, 383 F. Supp. 2d at 101). In general, "a court will grant a motion for reconsideration of an

9

interlocutory order only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order." *Stewart v. Panetta*, 826 F. Supp. 2d 176, 177 (D.D.C. 2011) (quoting *Zeigler v. Potter*, 555 F. Supp. 2d 126, 129 (D.D.C. 2008)). "The party seeking reconsideration bears the burden of proving that some harm would accompany a denial of the motion to reconsider . . . [and] that some sort of injustice will result if reconsideration is refused." *Isse*, 544 F. Supp. 2d at 29. A court may deny a motion for reconsideration that "raises . . . arguments for reconsideration the court has . . . already rejected on the merits." *Henok v. Chase Home Finance, LLC*, 947 F. Supp. 2d 6, 10 (D.D.C. 2013).

### B. Hostile Work Environment Claim

Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Sex discrimination includes creating a hostile or abusive work environment if the harassment is sufficiently abusive to affect a term, condition, or privilege of employment." *Davis v. Coastal Intern. Sec., Inc.*, 275 F.3d 1119, 1122 (D.C. Cir. 2002) (citation omitted). To make a prima facie hostile work environment case under Title VII, the plaintiff must show that "(1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment; and (5) the existence of respondeat superior liability." *Id.* at 1122–23 (citation omitted).

The first three prongs of the analysis were not and still are not in dispute. As to the fourth prong, the Court previously found that there was a genuine issue of material fact as to whether Mr. Miller's alleged harassment of Ms. Lyles rose to the level of "severe or pervasive" conduct. The parties do not contest this finding in their supplemental briefs, and the Court has no reason to alter that conclusion upon reexamination of the record.

As to the last factor, because this case presented "a unique factual twist on the employer liability prong of a sexual harassment analysis—that of a *subordinate* (Mr. Miller) allegedly harassing a supervisor (Ms. Lyles)," [3] *see* Mem. Op. at 14, the Court held that:

> An employer may be held liable for the harassment of a supervisor by a subordinate if the employer knew or should have known of the harassment and failed to implement prompt and appropriate action; but an employer will not be liable for the sexual harassment of a supervisor by a subordinate where the supervisor-plaintiff had the ability to stop the harassment[4] and failed to do so. The Court finds this standard to be the most appropriate because it empowers the supervisor to remove or reprimand the subordinate-harasser, while ensuring that if the supervisor is unable to address the harassment and reports the subordinate-harasser to her supervisors, *i.e.*, takes action to stop the harassment, and it is unsuccessful or the employer resists such actions, the employer will still be liable for allowing the hostile work environment to persist despite being on notice of the problem.

*See* Mem. Op. at 14–15. Because the parties had not briefed the case using that legal standard, the Court asked the District to renew its motion for summary judgment in light of that standard. *See* Order, ECF No. 52. Now that that motion is ripe, the Court analyzes whether Ms. Lyles "had the ability to stop the harassment" and failed to do so.

---

[3] *See generally* Ann Carey Juliano, *Harassing Women with Power: The Case of Including Contra-Power Harassment Within Title VII*, 87 B. U. L. Rev. 491 (2007).

[4] As the Court noted, "[t]his could include reporting the harassment to the supervisor's own supervisor, but it could also include doing something to effect a 'significant change in employment status,' *see Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013), of the harasser, such as firing, or reprimanding the employee. This will be different in each case, depending on the authority the particular supervisor has over the particular harasser." *See* Mem. Op. at 15 n.8

The District argues that Ms. Lyles "had the ability to stop Mr. Miller's alleged harassment and believed that she had done so." Def.'s Mot. Summ. J. & Reconsideration 8, ECF No. 57. The District points to Ms. Lyles's deposition testimony where she stated that her situation with Mr. Miller "was not significant because [she] handled" it herself, and that "[i]t was [her] responsibility to control such behavior." Lyles Dep. at 80:1-3, 85:6-11, ECF No. 57-3. Meanwhile, Ms. Lyles argues that she did not have the ability to stop Mr. Miller's harassment because both she and Mr. Miller were supervised by Mr. Parks, and it was Mr. Parks's responsibility to stop the harassment. *See* Pl.'s Opp'n Mot. 6, ECF No. 59. The Court finds that there is still a genuine issue of material fact as to whether Ms. Lyles "had the ability to stop the harassment," and failed to do so. As such, the Court will deny the District's motion for summary judgment on this issue.

In its prior opinion, the Court opined that there might be a factual issue as to whether "(1) Ms. Lyles ever took action herself to stop the harassment by reporting it to her supervisor and (2) if she did, whether the District failed to take prompt or appropriate action in response." *See* Mem. Op. at 17. The Court also acknowledged that the District of Columbia's Sexual Harassment Policy provides that "[a]ny supervisor or manager who receives a complaint or concern regarding sexual harassment or inappropriate conduct must take reasonable steps to ensure that an investigation is conducted or that other appropriate action is taken . . . ." *See* Mem. Op. at 17 n.11 (quoting Def.'s Ex. A at 3, ECF No. 45-1). The Court went on to note that "Ms. Lyles took action by contacting Mr. Parks but it is unclear whether she was supposed to do anything else, or whether she had the authority to 'effect a significant change in [Mr. Miller's] employment status.'" *See id.* (quoting *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2443 (2013)).

Even with the guidance of the parties' renewed motions, it still remains unclear to the Court whether Ms. Lyles had the "ability to stop the harassment" as Mr. Miller's supervisor. As the District points out, Ms. Lyles stated in her deposition that she thought she handled the Mr. Miller situation herself, and that it was her responsibility to stop Mr. Miller's sexual harassment. *See* Lyles Dep. at 80:2-3, ECF No. 57-3 ("I thought I handled it with Mr. Miller myself."); Lyles Dep. at 85:6-7 ("It was my responsibility to control such behavior. I cautioned Mr. Miller that since he was on probation that it was inappropriate; that I did not like it. That if he did not cease his behavior, then I would have to go further with it."); *see also* Lyles Dep. at 80:5-10 ("I cautioned him about his inappropriate touching and his verbal innuendo and his hand gestures, that it was not appreciated, and that he needed to cease in that kind of behavior and to conduct himself as a professional."). Her statements thus suggest that she had the ability as his supervisor to take corrective action to stop the harassment. In addition, she submitted at least one written report regarding Mr. Miller's job performance, suggesting that she had the ability to effect a significant change in his employment. *See* Pl.'s Ex. 12, ECF No. 46-13.

But the record is unclear when, if ever, Mr. Miller's harassment stopped, and therefore, it is unclear whether Ms. Lyles did have the "ability" to stop it. First, it is unclear whether Ms. Lyles could terminate Mr. Miller's employment, or do anything more than "caution" him about his behavior, and the parties have not pointed to any evidence or policy to guide the Court on this matter.

Second, if Ms. Lyles's next option was to report Mr. Miller's conduct to *her* supervisors, it is unclear from the record whether her employer had notice of the problem, and if so, of what incidents it had notice. For instance, Ms. Lyles met with Mr. Parks, her supervisor, in June 2007, where she told him about Mr. Miller's sexual harassment of herself and two other women. *See*

13

Pl.'s Resp. to Interrogatory No. 4, ECF No. 46-2 ("In this meeting, the Plaintiff informed Mr. Parks of harassment that she was experiencing from Mr. Miller."). "The District does not dispute that during the June 14, 2007 meeting Plaintiff reported that she was also harassed by Mr. Miller." *See* Def.'s Reply 2. However, Ms. Lyles stated that in July 2007 and August 2007, more incidents of harassment occurred. *See* Pl.'s Resp. to Interrogatory No. 7, ECF No. 46-2 ("On or around July or August 2007, Mr. Miller grabbed the Plaintiff's buttocks when the Plaintiff was leaving Mr. Miller's office following a meeting. The Plaintiff responded that Mr. Miller's advances were unwelcome and inappropriate. On or around August 2007, Mr. Miller grabbed the Plaintiff's breast while they were in the Plaintiff's office."). She also stated that "sometime in 2008," Mr. Miller grabbed her breast. *See* Lyles Dep. at 84:15-85:2. In addition, Ms. Lyles stated that even after Mr. Miller was transferred to a different department in November 2007, "he continued to harass the Plaintiff through August 2008," and the District "failed to take any additional corrective actions." Pl.'s Resp. to Interrogatory No. 8, ECF No. 59-4.

The District argues in its renewed motion that Mr. Parks no longer had an obligation to investigate the harassment because, at or around the time of her June 2007 meeting with Mr. Parks, Ms. Lyles determined that Mr. Miller's harassment "was not significant because I handled it." Lyles Dep. at 80:2-3. *See* Def.'s Mot. 8. If this was not disputed, the Court would be inclined to find for the District, as Ms. Lyles took action to stop the harassment, and told her supervisor she had taken care of the problem.

However, Ms. Lyles argues that she reported the continued post-June 2007 harassment to her supervisor, and that her supervisor failed to do anything to correct the problem. *See* Lyles Dep. at 179:1-22, ECF No. 59-5 (explaining that she reported the August 2008 incident where

14

Mr. Miller touched her breast to Mr. Parks, Mr. Baron, and Juanita Price). As the District acknowledges, the facts on this point are muddled.[5] At one point, Ms. Lyles states that "sometime in 2008," Mr. Miller grabbed her breast and she did not "report that to anyone" because it was her responsibility to control that behavior. *See* Lyles Dep. at 84:15-85:7, ECF No. 57-3. And her interrogatory response only mentions a June 2007 meeting with Mr. Parks where she reported Mr. Miller's sexual harassment. *See* Pl.'s Resp. to Interrogatory No. 4, ECF No. 59-4. However, that same Interrogatory answer mentions that Ms. Lyles emailed Mr. Boone in June 2008 updating him on "her outreach to Mr. Baron and Ms. Price regarding her harassment." *Id.* Her outreach to Mr. Baron about a hostile work environment in June 2008 is corroborated by a letter written from Mr. Baron to Ms. Lyles, saying "I am in receipt of a letter dated June 27, 2008, from your physician . . . requesting that you be reassigned to a *non-threatening, non-hostile work environment* for medical reasons." *See* Pl.'s Ex. 23, ECF No. 46-24 (emphasis added). Ms. Price, meanwhile, also testified in her deposition that she knew about Ms. Lyles's reports of sexual harassment, but the record is unclear on the timing. *See* Price Dep. at 42:18-22, ECF No. 59-8 (responding "I do recall that, yes," when asked "Mr. Parks brought up to you concerns or allegations that Mr. Miller had harassed Ms. Lyles?").

Moreover, Mr. Parks stated that he "recalled" that Ms. Lyles reported incidents of Mr. Miller's harassment—though, it is unclear exactly what incidents she reported to him and when. *See* Parks Dep. at 57–58, ECF No. 46-8 (saying that he was informed that Ms. Lyles "made

---

[5] The District argues in its Reply brief that "Plaintiff has not made a clear record about when these incidents took place," and that "Plaintiff provided confusing and contradictory testimony about whether she reported these incidents [post-June 2007] to Parks." Def.'s Reply 2–3, ECF No. 61. But any factual discrepancies in the record further support the Court finding summary judgment inappropriate in this case. And the factual discrepancies are not so contradictory or incredible as to warrant summary judgment for the defendant, as the District unpersuasively argues.

claims that Mr. Miller sexually harassed her" and also stating, "I do recall there was an incident that she had alleged, I recall that . . . . I'm saying I remember something about a phone call. I'm not sure if the phone call came from Ms. Lyles or Ms. Yearwood about her concern about interacting with Mr. Miller, I believe."). In sum, it is evident that Ms. Lyles reported incidents of continued harassment to her supervisors, but the timing and substance of those reports is unclear. As such, the Court cannot say that as a matter of law, the District was not on notice of the problem.

The record thus shows that Ms. Lyles took some action as Mr. Miller's supervisor to stop the harassment, and that Ms. Lyles told her own supervisor about Mr. Miller's behavior. But the record is unclear as to what particular incidents Ms. Lyles reported and when, and there are too many factual disputes on the record regarding Ms. Lyles's "ability to stop the harassment" as a whole—either by taking action herself, or reporting to her supervisors—for the Court to grant the District summary judgment. *Accord Mingo v. Roadway Express, Inc.*, 135 F. Supp. 2d 884, 891, 898 (N.D. Ill. 2001) (noting that the plaintiff, a female supervisor, "never reprimanded, counseled, or disciplined any of [the] dock workers whom she supervised for their [offensive] comments," but ultimately finding that there was a genuine issue of material fact as to whether her employer had notice of her sexual harassment allegations and failed to do something about it). Thus, the Court must deny the District's renewed motion for summary judgment on this claim.

### C. Retaliation Claim

The District next takes issue with the Court's treatment of Ms. Lyles's retaliation claim, arguing that "the Court erred by reviewing Plaintiff's burden to show that the District's explanation for the transfer was pretextual under a less rigorous standard than it did for her

disparate treatment claims." *See* Def.'s Mot. Summ. J. & Reconsideration 1–2. The District contends that the Court's finding that there was pretext in the context of the retaliation claim, but not in the context of the disability discrimination claim is "incongruent." *See id.* at 9. The District also believes the D.C. Circuit and the Supreme Court have revised the legal test for proving retaliation in a Title VII case. *See id.* at 10 (citing *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) & *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013)). Meanwhile, the plaintiff does not contest the Court's ruling, but acknowledges that the D.C. Circuit "recently slightly modified the elements for retaliation under Title VII." *See* Pl.'s Opp'n Mot. 7 (citing *McGrath*, 666 F.3d at 1379). The Court does not find that "justice requires" reconsideration of this issue, and will accordingly deny the District's motion for reconsideration of this issue.

First, there is nothing incongruent about finding that the District's legitimate, non-discriminatory reason is not pretextual in the discrimination context, but is pretextual in the retaliation context. Indeed, the Court acknowledged that because of the differing elements of a claim for retaliation and discrimination, it was possible for the Court to find the same non-discriminatory reason to be pretextual in the context of one but not the other. *See* Mem. Op. at 20 n.16. In this case, as the Court noted, there was no evidence on the record that the District harbored any discriminatory animus toward the plaintiff based on her disability, or that it treated her differently than a similarly situated employee, and as such, there was no evidence in the record indicating that the District's reason for moving Ms. Lyles to the Day Services Program was *discriminatory*.

Importantly, there was evidence that the move to the Day Services Program—while not based on *discriminatory* animus—was done *in retaliation* for Ms. Lyles engaging in protected

17

EEO activity. Specifically, the Court found that in addition to there being suspicious timing between Ms. Lyles's June 2008 EEOC complaint alleging disability and sex discrimination, and her August 2008 detail to the Day Services Program, the District's non-discriminatory reason was weak, as the District did not explain why the "staff need" had to be filled by Ms. Lyles and not someone else. *See* Mem. Op. at 25 n.19. The Court also found it suspect that Ms. Lyles had always received acceptable or excellent performance reviews[6] and had not been transferred in 14 prior years of service—especially not to a position such as Day Services where her responsibilities were seriously diminished. *See* Mem. Op. at 24–25. As such, the Court concluded that a reasonable fact-finder could conclude that the District's reason for transferring Ms. Lyles was a pretext and that it only transferred Ms. Lyles because she filed an EEOC complaint.

This result does not change based on the D.C. Circuit's "revised statement" in *McGrath v. Clinton*, or the Supreme Court's decision in *Nassar*. In *McGrath*, the court stated that "[t]o prove unlawful retaliation, a plaintiff must show (1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice." 666 F.3d at 1380. The

---

[6] Though the District does not make this point, the Court notes that the March 2008 letter proffered by the District regarding the redesign of the Supported Employment Program mentions Ms. Lyles's failure to attend two meetings to discuss the redesign, and also mentions Mr. Parks's desire "to review and discuss" Ms. Lyles's "role with the Supported Employment Program." Def.'s Ex. J, ECF No. 45-2. The tone of the letter is inconclusive, as Mr. Parks closes by saying "I am looking forward to your continued productive and positive role with the Supported Employment Program." *Id.* Though this letter may slightly undermine Ms. Lyles's record of receiving good or excellent performance reviews, a reasonable fact-finder could still conclude that in light of all the circumstantial evidence presented, the District's proffered reason for transferring Ms. Lyles to the Day Services Program was a pretext, for the reasons set forth above. Moreover, this letter is unrelated to Ms. Lyles's transfer to the Day Services Program, as the "redesign" was not the District's proffered reason for transferring Ms. Lyles *to Day Services*, but rather, "loss of staff in the Day Program to the Early-Out and resignations" was the District's proffered reason for that transfer. *See* Def.'s Ex. L, ECF No. 45-2.

Supreme Court clarified the causation prong recently, saying that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in [42 U.S.C.] § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533.[7] Under either of those standards, or the standard articulated by the Court, *see* Mem. Op. at 21 (citing *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003)), there is a genuine issue of material fact as to whether the District transferred Ms. Lyles *because* she filed an EEOC complaint, or *because* they really needed her in the Day Services Program. As such, justice does not require that the Court reconsider its prior decision on this issue.

### IV. CONCLUSION

For the foregoing reasons, the District's motion for summary judgment and for reconsideration is DENIED. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: August 27, 2014                                        RUDOLPH CONTRERAS
                                                              United States District Judge

---

[7] Importantly, after *Nassar*, the motivating or substantial factor test in a mixed-motive retaliation case is no longer permitted. This is not a mixed-motive case—*i.e.*, one where the employer has proffered both legitimate and illegitimate reasons for the adverse employment action. *See Gross v. FBL Fin. Svcs., Inc.*, 557 U.S. 167, 171 (2009) (describing a mixed-motives retaliation case as one in which "an employee alleges that he suffered an adverse employment action because of both permissible and impermissible considerations"); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 260 (1989) (White, J., concurring) ("The Court has made clear that 'mixed-motives' cases, such as the present one, are different from pretext cases such as *McDonnell Douglas* and *Burdine*. In pretext cases, 'the issue is whether either illegal or legal motives, but not both, were the 'true' motives behind the decision. In mixed-motives cases, however, there is no one 'true' motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate.") (citations omitted). And the parties have not briefed this case at any point on such a theory. Accordingly, the Supreme Court's decision in *Nassar* does not change this Court's retaliation analysis under a single-motive (pretext) theory.

19